No. 22-4020

In the

# United States Court of Appeals
## for the Sixth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

YANJUN XU, AKA XU YANJEN, AKA QU HUI, AKA ZHANG HUI

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of Ohio
No. 1:18-cr-43 (Black, J.)

**BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES**

For the Appellee:

KENNETH L. PARKER
United States Attorney

KEVIN KOLLER
Assistant United States Attorney
221 E. Fourth Street
Cincinnati, Ohio 45202
(513) 684-3711

# TABLE OF CONTENTS

Table of Authorities ................................................................. iii

Statement Regarding Oral Argument ...................................... vi

Statement of Jurisdiction ......................................................... 1

Issues Presented ....................................................................... 2

Statement of the Case ............................................................... 3

    A.  Xu conspires to steal aviation-related technology from
        multiple aviation companies over five years to benefit the
        Chinese government ...................................................... 3

        1.  Xu attempts to co-opt foreign aviation employees .............. 5

        2.  Xu uses cyber-espionage to target visiting aviation
            employees ........................................................... 10

        3.  Xu attempts to steal GE Aviation's trade secrets .............. 12

            a.  Xu attempts to recruit a GE Aviation engineer .......... 12

            b.  The FBI conducts an undercover investigation
               culminating in Xu's arrest in Belgium ....................... 14

    B.  Procedural history .................................................... 18

        1.  Indictment ......................................................... 18

        2.  Motion to dismiss ................................................. 21

        3.  Trial .................................................................. 22

4.    Sentencing and loss amount calculation ........................... 28

Summary of the Argument ..................................................... 34

Argument ............................................................................ 36

I.    Because neither Count 1 nor Count 2 of the indictment
was duplicitous, the district court did not err in denying
Xu's motion to dismiss. ............................................ 36

II.    The district court did not abuse its discretion, let alone
plainly err, in not striking portions of Olson's testimony ...... 43

III.    Xu's sentence was procedurally and substantively
reasonable ............................................................... 53

A.    The district court's loss calculation reasonably
estimated the intended loss to GE ................... 53

B.    The 240-month within-Guidelines sentence was
substantively reasonable ................................ 62

Conclusion ........................................................................ 66

Certificate of Compliance .................................................. 67

Designation of Relevant District Court Documents .............. 68

Certificate of Service ......................................................... 70

# TABLE OF AUTHORITIES

Cases:

*Braverman v. United States*, 317 U.S. 49 (1942) .............................. 37, 39

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) .................................................... 55

*Musacchio v. United States*, 577 U.S. 237 (2016).................................... 36

*United States v. Anderson*, 555 F. App'x 589 (6th Cir. 2014) ................ 43

*United States v. Campbell*, 279 F.3d 392 (6th Cir. 2002) ................. 36, 39

*United States v. Combs*, 369 F.3d 925 (6th Cir. 2004)............................ 45

*United States v. Cox*, 826 F.2d 1518, 1524 (6th Cir. 1987) .............. 47, 49

*United States v. Dunnican*, 961 F.3d 859 (6th Cir. 2020)............ 45-46, 50

*United States v. Harvey*, 653 F.3d 388 (6th Cir. 2011) ........................... 41

*United States v. Hills*, 27 F.4th 1155 (6th Cir. 2022) ............................. 41

*United States v. Howley*, 707 F.3d 575 (6th Cir. 2013).................... 54, 57

*United States v. Hughes*, 505 F.3d 578 (6th Cir. 2007) .......................... 43

*United States v. Jin*, 733 F.3d 718, 722 (7th Cir. 2013) ......................... 65

*United States v. Johnson*, 440 F.3d 832 (6th Cir. 2006) ......................... 42

*United States v. Kelley*, 461 F.3d 817 (6th Cir. 2006) ........................36-38

*United States v. McQuarrie*, 817 F. App'x 63 (6th Cir. 2020)................. 36

*United States v. Miller*, 73 F.4th 427 (6th Cir. 2023) ............................. 62

iii

*United States v. Miner*, 774 F.3d 336 (6th Cir. 2014). ............................ 51

*United States v. Pettigrew*, 77 F.3d 1500 (5th Cir. 1996) ....................... 44

*United States v. Pu*, 1:11-cr-699 (N.D. Ill. May 5, 2016) ....................... 65

*United States v. Sadler*, 24 F.4th 515 (6th Cir. 2022) ........................... 43

*United States v. Shaffer*, 781 F. App'x 404 (6th Cir. 2019) .............. 51-52

*United States v. Shaffer*, 2:16-cr-45 (E.D. Ky Aug. 10, 2017)................ 52

*United States v. Shi*, No. 17-cr-110 (D.D.C. Feb. 10, 2020) ................... 65

*United States v. Singer*, 782 F.3d 270 (6th Cir. 2015) ...................... 36, 41

*United States v. Spriggs*, 102 F.3d 1245 (D.C. Cir. 1996)...................... 44

*United States v. You*, 74 F.4th 378 (6th Cir. 2023) ......................... passim

*United States v. Warshak*, 631 F.3d 266 (6th Cir. 2010) ....................... 45

Statutes:

18 U.S.C. § 1831...........................................................................19-20, 47

18 U.S.C. § 1832................................................................................20, 47

18 U.S.C. § 3231.....................................................................................1

18 U.S.C. § 3553...................................................................................63

28 U.S.C. § 1291.....................................................................................1

Other authorities:

Fed. R. Evid. 103................................................................................ 43

Fed. R. Evid. 704.......................................................................... passim

U.S.S.G. § 2B1.1 ................................................................... 54, 60, 62

U.S.S.G. § 5G1.2 ............................................................................ 64

## STATEMENT REGARDING ORAL ARGUMENT

The facts and legal arguments of the parties are adequately presented in the briefs and the record. Oral argument is therefore unnecessary.

# STATEMENT OF JURISDICTION

Jurisdiction was proper in the district court under 18 U.S.C. § 3231 because Defendant-Appellant Yanjun Xu was charged with federal crimes. The district court entered its judgment of conviction and sentence on November 21, 2022. Xu filed a timely notice of appeal on November 29, 2022. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

.

## ISSUES PRESENTED

1.  Whether the district court erred in not dismissing Counts 1 and 2 of the indictment as duplicitous.

2.  Whether the district court abused its discretion, and for some statements plainly erred, in admitting testimony of a government expert witness whom Xu alleges opined on his mental state in violation of Federal Rule of Evidence 704(b).

3.  Whether the district court's 240-month total sentence, based on an intended loss calculation of approximately $50 million, was procedurally and substantively reasonable.

# STATEMENT OF THE CASE

A jury convicted Defendant-Appellant Yanjun Xu, a Chinese spy and member of China's clandestine Ministry of State Security, of conspiring to commit economic espionage and conspiring to steal trade secrets from multiple aviation companies over a five-year period. (R. 176, jury verdict, 3004-08.)[1] The jury also convicted Xu of attempting to commit economic espionage and attempting to steal trade secret technology from GE Aviation. (*Id.*) Xu appeals his convictions and his resulting 20-year sentence.

A. *Xu conspires to steal aviation-related technology from multiple aviation companies over five years to benefit the Chinese government.*

Xu, a Chinese national, joined the Chinese Communist Party in 2001 and, in 2003, began his career with the Chinese Ministry of State Security (MSS). (R. 180, trial tr., 3063-66; *see also* Ex. 21b, cadre approval form, A(I)-205.) The MSS serves as China's premier intelligence organization. (R. 161, trial tr., 2077.) It is responsible for

---

[1] Citations to those parts of the record that have been electronically filed include the record entry number, a brief description, and the PAGE ID#. Citations to Appellant's Trial Exhibit Appendix include the exhibit number, a brief description, and the appendix volume and page number.

China's foreign intelligence operations and routinely engages in espionage, targeting both proprietary information, such as trade secrets, and government classified information. (*Id.* at 2077, 2086.)

Xu rose through the ranks of the MSS, becoming the Deputy Division Director at the Sixth Bureau of Jiangsu Province. (*Id.*) Within the MSS, the Sixth Bureau is responsible for science and technology intelligence and plays a key role in the Chinese government's industrial and cyber-espionage activities. (*Id.* at 2077-78, 2080, 2083.)  Xu's duties focused on foreign military and commercial aviation technology. (*See* R. 180, trial tr., 3097, 3101-02, 3127-29.) While Xu typically operated from within China, he sometimes risked travelling abroad in pursuit of aviation technology. For instance, he indicated in a recorded conversation that he had to travel outside of China as part of an effort to obtain technology related to the United States' F-22 fighter plane.[2] (*Id.* at 3101-02.)

---

[2] He also travelled to the 2017 Paris Air Show, but did so under false pretenses: he posed as an employee of a cover organization, the Nanjing Luote Technology Information Center, did not disclose the true purpose of his visit on his visa application, and communicated using codenames with other MSS operatives on the trip. (R. 180, trial tr., 3237-43, 3250-52, 3403-04.)

From at least 2013 through his arrest in 2018, Xu, aided by his fellow MSS operatives, pursued proprietary aviation technology from foreign companies through a variety of means, including attempting to recruit co-optees at aviation companies and through cyber-espionage.

1. <u>Xu attempts to co-opt foreign aviation employees</u>.

Between 2013 and 2018, Xu and his colleagues in the Sixth Bureau lured numerous aviation experts from foreign companies to give presentations in China, with the objective of stealing proprietary information.

The purported expert exchanges followed the same general template, which tracked the recruitment cycle intelligence officers use to spot, assess, develop, and pitch sources. (*See* R. 192, trial tr., 4617-25.) Xu would pay the individuals' travel costs to China and would frequently provide them additional payments or other perks after they presented on aviation topics to local engineers. (*See*, *e.g.,* R. 189, trial tr., 4081; R. 190, trial tr., 4236.) Xu would coordinate the visits with domestic aviation experts, usually associated with state-owned aviation enterprises or the Nanjing University of Aeronautics and Astronautics (NUAA). (*See, e.g.*, R. 180, trial tr., 3164-68, 3194-95; R. 181, trial tr.,

5

3214-15.) The local experts would help Xu identify and understand the desired technology ahead of time, meet with the foreign experts, and analyze the information afterwards to determine its value and any possible follow up requests. (*See, e.g.*, R. 180, trial tr., 3164-73, 3114; R. 192, trial tr., 4514; R. 191, trial tr., 4323, 4327-28.) Xu also collaborated with other MSS operatives. This included his direct supervisor Zha Rong[3] and his colleague Chai Meng, both of whom assisted in recruiting visiting experts. (*See* R. 180, trial tr., 3152, 3090-91, 3198-99; R. 181, trial tr., 3213, 3217.)

Xu typically operated under an alias during the exchanges, concealing his identity and true purpose. He often posed as Qu Hui, a director of the Jiangsu Provincial Association for Science and Technology (JAST). (R. 180, trial tr., 3039-40). On more than one occasion, he sent messages to his co-conspirators to ensure that his cover was not accidentally blown. For instance, in the lead up to one exchange, he sent a message to the local university contact reminding

---

[3] Appellant's brief describes Zha Rong as an "NUAA official." (Br. at 20.) Evidence recovered from Xu's devices and cloud accounts conclusively established, however, that Zha was actually an MSS Division Director. (*See, e.g.*, R. 180, trial tr., 3133-43.)

him that "the expert does not know my true identity, I approached him with the name under [JAST]." (R. 181, trial tr., 3215.) Similarly, on another occasion he wrote to an MSS colleague that the "guest doesn't know our identity. I've approached him in the name of Hui Qu, the Deputy Secretary-General of the Science and Technology Association." (R. 180, trial tr., 3201; *see also* R. 181, trial tr., 3257-58 (approaching a different expert under the alias Zhang Hui).)

Xu generally targeted ethnic Chinese individuals with connections to China. This included Bin Liang, a Stork Fokker engineer from Washington state (R. 180, trial tr., 3191-3201); Dr. Linda Li, an aerospace engineer who worked for various aviation companies (R. 181, trial tr., 3253-56); and Sun Li, a Boeing IT Project Manager who rebuffed Xu's advances because he felt Xu was seeking information on his work that he could not provide. (R. 189, trial tr., 4053-65, 4083, 4086-87).

On one occasion, Xu became the handler for Arthur Gau, an employee of Honeywell Aerospace, one of the major global producers of jet aircraft engines, who had previously been recruited by Xu's MSS supervisor Zha Rong. (R. 190, trial tr., 4184-87; R. 191, trial tr., 4489.)

Between 1997 and 2003, Gau accepted several paid trips to China in exchange for presenting on his work. On one of the trips, he also accompanied Zha on a site-seeing cruise that Zha had arranged and funded. (R. 190, trial tr., 4194-97.) In 2014, Zha reached out to Gau via email to reconnect. (*Id.* at 4207-08.) When Gau visited China two years later, Zha introduced Gau to Xu and gave Gau $3,000 even though Gau had not presented on the trip. (*Id.* at 4210-12.)

The next year, Gau agreed to present on his work in China. (*Id.* at 4212.) In the lead up to the exchange, Zha and Xu requested that Gau bring "materials" with him from the United States. (*Id.* at 4216-19.) In advance of his presentation, Gau emailed seven files that contained export-controlled Honeywell materials that he was not authorized to distribute. (*Id.* at 4188-90). He traveled to China in October 2017 and gave a presentation in a hotel room to Xu, three engineers, and two of Xu's MSS colleagues. (*Id.* at 4228.)

Unbeknownst to Gau, Xu recorded his hotel presentation. The audio recording also captured a covert discussion between Xu and the other attendees when Gau was not in the room. (R. 191, trial tr., 4314-16.) In the recording, Xu outlines the methodology behind the expert

8

exchanges to the local engineers. (*See id.* at 4315-28; Ex. 86c, transcript, A(III)-810-54.) Among other things, he describes how he and his MSS colleagues identify potential targets within specific companies, such as Boeing and Lockheed Martin, and highlights that the companies' security protocols often make it difficult for the experts to bring material directly to them. (Ex. 86c, transcript, A(III)-813, 845-47). Xu tells the engineers that the exchanges "really serve the technology aspect for the State" and that by collaborating and helping identify relevant technology they are all "serving the State." (*Id.* at A-827, 835.) He also assures them that "funding for the aviation field is not a problem." (*Id.* at A-835.)

Xu gave Gau $1,200 for his airfare and an additional $5,000 for his presentation. (R. 190, trial tr., 4236-37.) Xu also arranged and paid for Gau to attend a two-and-a-half day sight-seeing trip with two other individuals—one of whom was Xu's MSS colleague Chai Meng operating under an alias. (*Id.* at 4288, 4233-37.) When Gau returned to the United States, Xu's subordinate sent him messages in which she discussed the possibility of another visit. She also sent him a two-page document

asking for his help on topics related to turboshaft engine controls, to which Gau did not respond. (*Id.* at 4238-39.)

Gau never informed Honeywell about his meetings with Zha and Xu. (*Id.* at 4242.) In 2021, he pled guilty to violating export control laws related to the materials he distributed as part of his 2017 presentation. (*Id.* at 4190, 4241.) *See also United States v. Gau*, 2:21-cr-41 (D. Az.).

2. <u>Xu uses cyber-espionage to target visiting aviation employees</u>.

Xu also sought to procure aviation-related proprietary information for the Chinese government via cyber-espionage, *i.e.* by hacking the computers of employees of foreign aviation companies when they visited China. This included a 2014 targeted hacking of Safran Aircraft Engine, a French aviation company that partners with GE Aviation to produce engines using GE's proprietary fan blade technology. (R. 189, trial tr., 4039-40; R. 191, trial tr., 4445-46.) In November 2013 and January 2014, Frederic Hascoet, a Safran employee, traveled to China to visit Safran's Chinese subsidiary to monitor the progress of the assembly of engine parts. (R. 189, trial tr., 4043.) On both occasions he brought his company laptop and worked closely with Tian Xi, a local Chinese engineer. (*Id.* at 4043-45.) When he returned to France, however,

10

Safran discovered that multiple "trojan horse" malware viruses had been planted on his laptop. (*Id.* at 4046, 4097-4100.)

Messages subsequently recovered from Xu's devices show that Xu worked with Tian Xi to surreptitiously meet the "Frenchman" in November 2013 and to place the virus on his computer in January 2014. (*Id.* at 4113-19; R. 190, trial tr., 4138-40.) Xu then used a second local Safran employee, an IT security officer named Gu Gen, to monitor Safran's subsequent attempts to uncover the source of the malware. (R. 189, trial tr., 4125; R. 190, trial tr., 4143-52.) The messages also underscore Xu's role in the MSS and his relationship with MSS conspirators. He coordinated the hacking with Chai Meng, kept Zha Rong apprised of their progress, and worked to conceal their activities. (*See* R. 190, trial tr., 4145-51; *see also* Ex. 39b, messages, A(III)-654-55.)

Xu and Zha Rong engaged in similar conduct with Li Jiang, an aviation expert from the U.K. who worked on technology used in U.S. military planes. (R. 181, trial tr., 3212-16.) Xu, using the Qu Hui alias, met with Li Jiang multiple times in China, under the guise of expert exchanges. (*Id.*) According to Xu's diary entry for the day, Li Jiang attended a dinner with Zha Rong on April 20, 2014. (*Id.* at 3213.) The

11

calendar entry further indicates that the "Eighth [Division] applied techniques"—meaning MSS operatives attempted to copy the contents of Jiang's computer. (*Id.*; *see also id.* at 3211-18 (testimony that phrase 'Eighth Division applying techniques' refers to the copying of digital media or laptops).) But because the laptop was turned off, they could only work on the hard drive. (*Id* at 3213.) Xu enjoyed more success when Li Jiang returned in December 2014. At that time, Xu was able to complete the copying and cover his tracks while Zha kept Li Jiang occupied at dinner. (*Id.* at 3217-18.)

    3.  <u>Xu attempts to steal GE Aviation's trade secrets</u>.

    a. *Xu attempts to recruit a GE Aviation engineer.*

In March 2017, David Zheng, a GE engineer who specialized in GE's trade secret composite fan blade technology, was contacted via LinkedIn and invited to give a presentation at NUAA. (R. 192, trial tr., 4503, 4507, 4528-31.) The invitation purportedly came from Chen Feng, who claimed to be in charge of the International Cooperation and Exchange Office at NUAA. (*Id.* at 4531; *see also* R. 188, trial tr., 3919.)

Zheng agreed to present in May 2017, when he would be in China visiting family. Chen Feng indicated that NUAA would cover Zheng's

travel costs and suggested that Zheng present on the use of composite materials in aircraft engines. (R. 192, trial tr., 4533-34.) Zheng agreed, though he noted that he was required to sign a technical agreement and that he could not share GE proprietary information. (*Id.* at 4535.)

Zheng did not disclose his presentation to GE. Additionally, in preparation for his presentation, he downloaded five proprietary GE Aviation training materials that were export-controlled and saved them to his personal computer. (*Id.* at 4503-04, 4537.) Zheng did not obtain authorization from GE to do this. (*Id.*)

On the trip, Chen scheduled a special meeting for the purpose of introducing Zheng to Xu. (*Id.* at 4509-10, 4542-43, 4550.) Xu identified himself as Qu Hui, represented that he was the deputy director of the Jiangsu Province of Science and Technology Association, and provided Zheng a business card consistent with this alias. (*Id.*)

Later that day, Zheng presented to a group of approximately 20-30 people. (*Id.* at 4555.) After the presentation, Chen gave Zheng $3,500 in cash and told him it was reimbursement for the plane ticket and for giving the presentation. (*Id.* at 4556-58.) Zheng understood that the money actually came from Xu. (*Id.*) Zheng dined with Xu and two

13

professors later that evening. (*Id.*) A few days after Zheng returned to the United States, Xu extended a standing invitation to return to China to give additional presentations. (*Id.* at 4559-61.)

      b. *The FBI conducts an undercover investigation culminating in Xu's arrest in Belgium.*

In the fall of 2017, the FBI began investigating Zheng's trip to China. (R. 180, trial tr., 3035-36, 3039.) The FBI interviewed Zheng in November 2017. (*Id.* at 3037.) Following that interview, Zheng agreed to cooperate with the FBI's investigation and entered into a non-prosecution agreement with the government. (R. 181, trial tr., 3305-06; R. 192, trial tr., 4504-05.)

At the FBI's direction, Zheng contacted Chen and Xu in late November 2017 and expressed an interest in participating in an additional exchange. (R. 181, trial tr., 3306.) Xu responded positively, telling Zheng to send his travel details. Xu informed Zheng that he would "touch based with the scientific research department here to see what technology is desired." (R. 181, trial tr., 3325-27; R. 192, trial tr., 4514.) Xu later indicated to Zheng that he was interested in the "system code," meaning the system specification and design process for GE's trade secret composite fan blade encasements. (R. 181, trial tr., 3329.)

14

Xu also warned Zheng that, if Zheng were to send him documents, it would be better if he did not use his GE company email. (*Id.* at 3331.)

In February 2018, Zheng, under the direction of the FBI and with GE's permission, emailed Xu a one-page PowerPoint slide that the FBI had obtained from GE. The slide referred to the "Fan Containment Case Design Consensus Review" for GE's next generation commercial engine and included a stamp stating it was "GE Designated: Confidential." (*Id.* at 3332-35.) Zheng's accompanying email asked if the attached slide was the system code Xu had mentioned in his communications. (*Id.*)

Xu responded that he would like Zheng to meet directly with the local Chinese experts. He also asked Zheng to look over an attached file that contained "domestic requirements." (*Id.* at 3336-38.) The attachment contained specific detailed questions related to Zheng's work at GE on composite fan blade technology. (R. 192, trial tr., 4516.) According to GE's chief engineer for polymetric composites, the answers to those questions would be considered proprietary and would not be shared by GE. (R. 191, trial tr., 4459-62.)

Xu sent Zheng a second email tasking him to create a "file directory" of his computer. Xu included an attachment that provided

step-by-step directions on how to create the directory, which would generate a list of every file on Zheng's GE computer. (R. 181, trial tr., 3339-41.) The FBI approached GE and requested that it create a doctored file directory that removed any material that GE considered too sensitive to share. (*Id.* at 3348.) GE did this, and the resulting sixty-six page directory was sent to Xu. (*Id.* at 3348-50.)

The pace of communication from Xu increased following his receipt of the doctored file directory, with Xu emailing and calling Zheng to discuss the file directory and associated files. (*Id.* at 3351, 3555, 3360, 3666-70.) Around this time, at the FBI's direction, Zheng informed Xu that he would not be able to travel to China that spring as his employer was requiring him to travel to Europe instead. (*Id.* at 3346.) Xu agreed to meet Zheng in Europe. In anticipation of that meeting, Xu tasked Zheng with bringing his work computer with him to Europe. (R. 192, trial tr., 4523-24; R. 181, trial tr., 3378.) Later, concerned that he might not be able to access the files from Zheng's GE computer in Europe, Xu also tasked Zheng with downloading the files onto a portable storage drive prior to traveling. (*Id.*)

16

Xu traveled to Europe, posing as an employee with the Nanjing Luote Technology Information Center and using codenames in his chats with his fellow MSS operatives. (R. 180, trial tr., 3048; R. 181, trial tr., 3403-04.) When Zheng and the FBI insisted the meeting take place in Belgium, Xu proposed meeting at a coffee shop where Zheng would not be seen by any of his GE co-workers. (R. 191, trial tr., 4312.) On April 1, 2017, Belgium police arrested Xu and an MSS colleague, Xu Heng, at the agreed meeting location at the request of the United States. (R. 180, trial tr., 3041; R. 187, trial tr., 3680-85.) Xu was later extradited to the United States based on the indictment in this case.

At the time of his arrest, Xu had multiple blank memory cards for storing data, a memory card reader, and plain brown envelopes containing $7,000 and €7,720 in cash. (R. 187, trial tr., 3707-08, 3784-85.) He also had a laptop with an encrypted hard drive and a separate, one terabyte hard drive that was predominately empty. (*Id.* at 3785-86.)

Law enforcement officers confiscated four total cell phones from Xu and Heng. FBI agents performed extractions on three of the phones, from which they recovered numerous documents and messages related to Xu's work as an intelligence officer and his attempts to acquire

17

aviation trade secrets from foreign companies. (R. 187, trial tr., 3751-77; *see also* R. 181, trial tr., 3063-90.) Agents were not able to recover any information from the fourth phone, however, because it was remotely wiped shortly after Xu's arrest. (R. 187, trial tr., 3777-82.)

Agents discovered hundreds of photos of Zheng and his family on one of the phones. (*Id.* at 3768.) They also recovered two additional photos related to the meeting with Zheng: (1) a photo of a typewritten questionnaire that includes notes under topics such as "family situation," "work situation," and "personal needs" (*Id.* at 3740-44; *see also* R. 181, trial tr., 3402; R. 192, trial tr., 4663-64); and (2) a photo of a handwritten note that included detailed questions, and a diagram, related to GE's composite fan blade technology (R. 187, trial tr., 3740-41). According to GE's chief engineer, discussion of the topics in the second photo would involve secret information about the technology that GE was trying to protect. (R. 191, trial tr., 4474-75.)

*B. Procedural history*

1. <u>Indictment</u>

A Southern District of Ohio grand jury returned a four-count indictment against Xu in April 2018. (R. 1, indictment, 1-16.) The

indictment alleged that China sought to acquire foreign aviation and aerospace technology through the theft of industrial information and that Xu's duties on behalf of the MSS including "obtain[ing] technical information, including trade secrets, from aviation and aerospace companies in the United States and throughout Europe." (*Id.*)

Count 1 of the indictment charged Xu with conspiring to commit economic espionage in violation of 18 U.S.C. § 1831(a)(5). Specifically, the indictment alleged that from in or about 2013 continuing to at least April 1, 2018, Xu conspired with others, including C.F. and other MSS officers, to steal or obtain without authorization aviation-related trade secrets to benefit the Chinese government. (*Id.* at 5.)

The indictment identified some of the manner and means by which Xu and his co-conspirators sought to accomplish the objects of the conspiracy. (*Id.* at 6-7.) It also listed numerous overt acts taken in furtherance of this long-running conspiracy. This included messages Xu sent in 2013 and 2014 about the need to conceal his true identity from Bin Liang and Li Jiang during their "exchanges," as well as various overt acts related to Xu's attempt to induce Zheng to disclose trade

secret information about GE's composite fan blade technology. (*Id.* at 8-12.)

Count 2 of the indictment charged Xu with a similar conspiracy to commit trade secret theft in violation of 18 U.S.C. § 1832(a)(5). It alleged that Xu and his co-conspirators knowingly agreed to steal aviation-related trade secrets; that they intended to convert the trade secrets to the economic benefit of somebody other than the owners of the trade secrets; and they intended and knew their offense would injure the owners of the trade secrets. (*Id.* at 13.) The alleged conspiracy occurred over the same time period and included the same manner and means and overt acts as the conspiracy charged in Count 1.

Whereas Counts 1 and 2 charged Xu with overarching conspiracies that lasted from 2013 to 2018, Counts 3 and 4 related just to Xu's attempt to acquire GE's secret composite fan blade technology in 2017 and 2018. (*Id.* at 14-15.) Count 3 charged him with attempted economic espionage by theft or fraud in violation of 18 U.S.C. 1831(a)(1) & (4). (*Id.*) Count 4 charged him with attempted theft of trade secrets by taking or deception in violation of 18 U.S.C. 1832(a)(1) & (4). (*Id.*)

2. <u>Motion to dismiss</u>

Xu moved to dismiss Count 1 and Count 2 on duplicity grounds prior to trial. (R. 55, mot. to dismiss, 367-87.) He claimed that the 2013 and 2014 communications related to Bin Liang and Li Jiang included in the indictment were not connected to the later targeting of GE and that, as such, the indictment impermissibly charged multiple conspiracies in both Count 1 and Count 2 (*Id.* at 383.)

The government responded that Count 1 and Count 2 each alleged a single conspiracy based on an agreement between Xu and his co-conspirators to obtain aviation trade secrets between 2013 and 2018. (R. 68, response, 487-91.) While each conspiracy count alleged "multiple players and multiple locales," "the conspirators within MSS knew each other, communicated with each other, and worked with each other on a regular basis towards the illegal conspiratorial objective." (*Id.* at 488-89.) As such, neither Count was duplicitous.

The district court held a motions hearing in January 2020. Defense counsel declined oral argument on the motion to dismiss and stated Xu would rely on the written briefing. (R. 84-1, sealed hearing tr., 845-46.) The court informed the parties in an April 2021 status

conference that it was going to deny the motion to dismiss. (R. 131, sealed status conf. tr., 1628.) In October 2021, it issued a follow-up notation order denying the motion to dismiss. (Oct. 14, 2021 notation order.) While the notation order stated that the court intended to issue a written order, the court has not done so.

   3. <u>Trial</u>

The case proceeded to trial in October 2021. At trial, the government relied on numerous documents recovered from Xu's devices and associated cloud accounts. This included documents that reflected his position as an intelligence officer with the MSS, a digital calendar that Xu used as a quasi-diary that documented many of his meetings with foreign experts, and various chats and emails related to his work as an MSS officer. (*See, e.g.*, R. 180, trial tr., 3063-78; Ex. 29b, calendar, A(II)-315.)  In addition to the documentary evidence, the government offered testimony from various law enforcement officers as well as from Frederic Hascoet (R. 189, trial tr., 4039), Sun Li (*id.* at 4053), Arthur Gau (R. 190, trial tr., 4184), and David Zheng (R. 192, trial tr., 4498) about their interactions with Xu.

The government also called several opinion witnesses. Nick Kray, GE's Chief Consulting Engineer for polymetric composites, testified about GE's proprietary composite fan blade technology.  He explained that GE Aviation has been the world leader in the field since it first developed the technology for use in aircraft engines around 1995. (R. 191, trial tr., 4440-44.) The technology cost hundreds of millions of dollars and decades of research to develop to its present form. (*Id.* at 4366, 4440, 4444, 4489.) The investment paid off, however, as no other aviation company has successfully certified an engine based on composite fan technology. (*Id.* at 4440, 4458; *see also* R. 189, trial tr., 4002, 4009 (testimony from Defense Technology Security Administration division chief that China has been trying to develop composite fan blade technology since at least 2015, but that it has not been able to replicate GE's success).)

Kray testified that GE derives a significant competitive market advantage from its fan blade technology because its composite materials are significantly lighter and more durable than materials used in competitors' engines, which in turn permits airplanes equipped with GE engines to fly farther on less fuel. (*Id.* at 4443, 4458.) Unsurprisingly,

23

GE considers its fan blade and containment system a "key technology,"
which it endeavors to keep secret. (*Id.* at 4457; *see also id.* at 4370-76
(testimony from Vice President of Cyber Security about ways GE
protects, and limits access to, its technology).)

The government also called Dr. James Mulvenon, an expert on
Chinese industrial espionage, and James Olson, a retired undercover
spy and former chief of counterintelligence with the CIA. Dr. Mulvenon
testified about the interrelationship between the Chinese government,
China's state-owned enterprises, and the MSS. He explained that for
decades the Chinese government has, with limited success, prioritized
developing its domestic aviation industry to compete with, and reduce
its reliance on, foreign companies. (*Id.* at 2069-70, 2076.) This is
reflected in China's strategic Five-Year Plans and its major "Made in
China 2025" industrial plan, which lists aviation as one of ten key
industries. (*Id.*) He also testified that the "Chinese government has a
very direct and active role in industrial espionage" and that the MSS is
the primary organization by which it pursues illicit technology transfers
to benefit its state-owned enterprises. (*Id.* at 2080-81, 2083, 2086.)

Olson testified about China's economic espionage strategy, including the MSS's use of the so-called expert exchange programs to co-opt foreign experts, and about general tradecraft within the intelligence community. (R. 192, trial tr., 4611-13, 4618-32.)  He identified tradecraft principles and techniques, such as the recruitment cycle used by both CIA and MSS operatives, and explained how Xu's actions toward Zheng were consistent with a covert intelligence-gathering operation. For instance, the initial invitation to Zheng through LinkedIn was consistent with the "spotting process," and the use of Chen Feng, a "distinguished, knowledgeable person in the aviation industry in China," to reach out to Zheng was "typical of a Chinese intelligence operation." (*Id.* at 4638.) Similarly, Xu's "Qu Hui" alias was "very consistent with the cover used by an intelligence officer" as it sounded prestigious and provided "him reason to be pursuing someone in the aviation industry." (*Id.* at 4639.) Olson also noted that Xu's modes of communication with Zheng were "very characteristic of an intelligence operation" and that his discussion of Zheng's personal life on recorded phone calls was "standard MO for all of us in the intelligence business." (*Id.* at 4639-42, 4648; *see also id.* (opining that

25

Xu's prep meetings with aviation experts were "consistent" with espionage and tradecraft).)

Olson opined that Xu's actions leading up to the meeting were also consistent with an intelligence officer engaged in tradecraft. This included Xu's email attaching a list of "domestic requirements," which Olson testified was "consistent with what I believe an intelligence service would have in the form of requirements" (*id.* at 4644), as well as Xu's request that Zheng download files to a USB drive in advance of the meeting (*id.* at 4654). Other indications of tradecraft included the use of a pre-briefing document outlining his cover story (*id.* at 4657-58), the envelope of cash and list of questions Xu brought to the meeting (id. at 4659-60, 4563), and the wiping of the phone after Xu was arrested (*id.* at 4663).

At one point, about halfway through Olson's direct examination, defense counsel objected to a question and asserted at sidebar that Olson's testimony was "excludable under 704(b)" because he was testifying about what Xu and his co-conspirators were "doing." (*Id.* at 4650-51.) The Court overruled the objection because Olson was not testifying to ultimate facts. (*Id.* at 4651.) Defense counsel did not renew

26

the objection, nor move to strike, after Olson answered the question.
(*Id.* at 4652.) Defense counsel did not object for the remainder of Olson's
testimony or make a continuing objection on Rule 704(b) grounds.

Olson's testimony concluded on a Friday. On Sunday, Xu informed
the district court via email that he intended to file a motion under Rule
704(b), and on Monday, he filed a motion to strike portions of Olson's
testimony. (*See* Nov. 1, 2021 notation order; R. 166, mot. to strike, 2367-
72.) The motion identified seven answers, in which Xu claimed Olson
had impermissibly opined on his *mens rea*. (*Id.*) The government
opposed the motion. (R. 168, response, 2574-79.) It asserted that Olson
had only testified that Xu's conduct was consistent with tradecraft and
that he had not opined on whether Xu intended to knowingly steal
information he believed to be a trade secret, properly leaving that
question to the jury. (*Id.*)

The district court denied the motion, but indicated it would
instruct the jury to disregard any opinion witness who appeared to
testify regarding the defendant's intent. (R. 216, charge conf. tr., 5487,
5507-08.) The court modified its proposed instruction at defendant's

27

request to specifically mention Olson by name (*see id.*) and instructed

the jury:

> [Y]ou are not to consider any opinion testimony regarding the defendant's state of mind or his intent. Therefore, as it relates to the testimony of James Olson, to the extent that Mr. Olson specifically testified that the defendant intended to steal trade secrets, you must disregard those limited portions of his testimony. This is because it is up to you and you alone to determine whether the defendant intended to steal trade secrets

(R. 195, trial tr., 4878.)

The jury subsequently returned a guilty verdict on all four counts.

(R. 176, verdict, 3004-07.)

4. <u>Sentencing and loss amount calculation</u>

At sentencing, the parties disputed the loss amount attributable

to Xu under U.S.S.G. § 2B1.1(b)(1). The probation office calculated the

intended loss to be between $65 million and $150 million based on GE's

conservative estimate that developing one engine cost $107 million

(later revised down to $98 million). (R. 197, PSR, 4907-08.) This equated

to a 24-level adjustment to the offense level and a Guidelines range of

262 to 327 months' imprisonment. (*Id.* at 4912.) Xu objected. He

asserted that any loss estimate would be "pure speculation," and that,

as such, the "loss amount under the guidelines must be zero." (*Id.* at 4921-27.)

The Court held a pre-sentencing evidentiary hearing in August 2022. (*See* R. 204, hearing tr., 4961-5107.) Following the hearing, both parties briefed the issue. Xu asserted that the district court should not consider any intended loss because the term appeared only in the commentary to the Guidelines, which he asserted was not binding on the court. (R. 205, def.'s obj., 5111-12.) If the court did consider intended loss, Xu asserted that the proper measure of such loss should be the potential reduction in GE's competitive advantage or market share, not the $98 million it cost to research and develop a jet engine. (*Id.* at 5113-18.) Xu claimed, however, that the intended loss should still be zero because "any future potential loss in 'competitive advantage' is utterly speculative." (*Id.* at 5118, 5122.)

The government responded that an intended loss of between $65 million and $150 million was correct. (R. 206, gov't mem., 5134.) It noted that the probation office's loss calculation was inherently conservative because it estimated only the potential loss to GE and did not attempt to capture the full range of loss associated with Xu's

criminal activities, which included targeting other aviation companies. (*Id.* at 5136.) The government agreed with the probation office that the cost of research and development is an appropriate estimate of intended loss under the Guidelines. (*Id.* at 5144 (citing U.S.S.G § 2B1.1 n.3(C)(2)).)

The government also set forth an alternate loss calculation based on the estimated market share loss GE Aviation would have suffered if Xu been successful and China had developed its own composite fan blade engine as intended. The government relied on GE's publicly available sales and revenue data as reported in its annual report. According to that data, GE had a 55% market share of the $73 billion aircraft engine market in 2019 (*Id.* at 5152.) That year alone, it reported $9.41 billion in revenue from new commercial engine equipment sales. (*Id.* at 5152-53.) If a Chinese engine based on stolen GE trade secrets captured even 1% of GE's new engine market, the loss to GE in just one year would be $94 million, similar to the $98 million it cost GE to build one new engine using its composite fan blade technology. (*Id.*)

The district found that Xu had intended to cause GE pecuniary harm. (R. 208, order, 5220-38.) It held, however, that the cost to GE of developing the trade secret information was not the proper intended loss measure because even if China "might have gained (or saved) $98 million in research and development costs, [that] does not mean that GE Aviation would have lost the entirety of the $98 million it put into research and development." (*Id.* at 5229.) Instead, the court calculated the loss amount based on the intended future loss to GE's market share.

The court used data from GE's publicly available 2019 Annual Report. While the government had proposed using GE's engine revenues, the court took a more conservative approach, relying instead on GE's annual profits from commercial aircraft engines. In addition, while Xu may have intended for China to establish global dominance over GE and to divert all of GE Aviation's customers to China, the court, "in an effort to extend all fairness to Defendant," constrained "its computation to reflect a more logical outcome." (*Id.* at 5235.) Specifically, it assumed a competing product would capture no more

than 1% of that business and limited the loss to just one year.[4] This

yielded an estimated intended loss of $ 50,094,000, which equated to a

22-level increase and a Guidelines range of 210 to 262 months'

imprisonment. (*Id.* at 5236-38; R. 214, sentencing tr., 5393.)

The government requested an upwards variance to 300 months'

imprisonment, citing the severity of Xu's crimes.[5] Defense counsel

requested a time-served sentence of approximately 55 months, arguing

that Xu was simply a Chinese spy doing his duty. (*Id.* at 5413-14, 5422.)

The court sentenced Xu to an aggregate sentence of 240 months'

imprisonment: the statutory maximum of 180 months' imprisonment on

---

[4] The court considered an alternate approach, based on the likely outcome that a competing engine developed by China would have considerable success in the Asian market. The court noted that capturing even 10% of that Asian market, which generated $1.4 billion in commercial equipment revenue, would result in a higher loss calculation than the one adopted by the court and increase Xu's offense level. (R. 208, order, 5236.) Giving Xu the benefit of the doubt, the court selected the more conservative estimate.

[5] The United States also highlighted Xu's role in placing a Chinese spy in the U.S. Army Reserves to obtain information regarding aviation technology. That spy, Ji Chaoqun, was prosecuted in the Northern District of Illinois and found guilty on three charges in September 2022. *See United States v. Chaoqun*, 18-cr-611 (N.D. Ill.). The government did not introduce evidence relating to Ji at Xu's trial because Ji's trial was still pending at the time but did include the evidence at sentencing. (*See* R. 209, gov't sentencing mem., 5252-57.)

Counts 1 and 3, concurrent to each other, and the statutory maximum of 120 months' imprisonment on Counts 2 and 4, concurrent to each other but with 60 months to run consecutive to the 180-month sentence on Counts 1 and 3. (R. 214, sentencing tr., 5437; R. 211, judgment, 5354-58.)

This appeal ensued.

33

# SUMMARY OF THE ARGUMENT

This Court should affirm Xu's conviction and sentence. First, neither Count 1 nor Count 2 of the indictment is duplicitous. Each count alleges a single conspiracy, not multiple discrete conspiracies, based on an overarching agreement between Xu and his co-conspirators, many of whom are fellow MSS operatives, to obtain aviation-related trade secrets from foreign companies between 2013 and 2018.

Second, the district court did not abuse its discretion, nor plainly err, in admitting all of James Olson's testimony. Olson never opined on whether Xu had the requisite *mens rea* to be convicted of any of the charges. Rather, he described in general terms the conduct of spies who knowingly attempt to steal secrets and identified instances where Xu's conduct was consistent with, and indicative of, tradecraft. Because Olson left it to the jury to infer that Xu's words and actions demonstrated an intent to steal trade secrets, his testimony was permissible under Rule 704(b).

Finally, the district court's sentence was neither procedurally nor substantively unreasonable. While Xu claims that the district court should not have considered intended loss, this Court has now held that

34

loss calculations under the Guidelines properly consider the pecuniary harm a defendant intended to cause. As the district court found, Xu intended that China would develop a competitor engine based on proprietary GE technology and thereby would capture part of GE's market share. The district court conservatively calculated the intended loss, limiting it to just 1% of GE's commercial aircraft engine profits over just one year. This was a reasonable estimation of the intended loss and not clear error.

The resulting within-Guidelines 240-month sentence was also substantively reasonable. It reflects the seriousness of Xu's crimes, including his long-running criminal conspiracy to obtain high value trade secrets from a variety of aviation companies, and provides both specific and general deterrence. The sentence also does not create unwarranted sentencing discrepancies as the defendants to whom Xu seeks to compare himself were company insiders, not international spies who systemically targeted American companies to benefit a foreign government.

# ARGUMENT

## I.    Because neither Count 1 nor Count 2 of the indictment was duplicitous, the district court did not err in denying Xu's motion to dismiss.

"Whether an indictment is duplicitous is a legal question that this Court reviews *de novo*." *United States v. Kelley*, 461 F.3d 817, 830 (6th Cir. 2006).

An indictment is duplicitous if it joins "two or more distinct and separate offenses" in a single count. *United States v. Campbell*, 279 F.3d 392, 398 (6th Cir. 2002). The primary vice of duplicity is that "a jury may find a defendant guilty on the count without having reached a unanimous verdict on the commission of any particular offense." *Id.* (quotation omitted). "[P]roof at trial is irrelevant to the question of whether an indictment is duplicitous." *United States v. Singer*, 782 F.3d 270, 276 (6th Cir. 2015), abrogated on other grounds by *Musacchio v. United States*, 577 U.S. 237 (2016). Rather, the proper inquiry is "whether the indictment can be read to charge only one violation in each count." *Id.*; *see also United States v. McQuarrie*, 817 F. App'x 63, 80 (6th Cir. 2020) ("[I]f the indictment may be read to charge but one crime in each count, the court will do so.").

36

A conspiracy count that alleges a single agreement to commit multiple crimes is not duplicitous. *Kelley*, 461 F.3d at 830. This is because "the conspiracy is the crime, and that is one [offense], however diverse its objects." *Id.* (quoting *Braverman v. United States*, 317 U.S. 49, 55 (1942)); *see also Braverman*, 317 U.S. at 53 ("The gist of the crime of conspiracy . . . is the *agreement or confederation* of the conspirators to commit one or more unlawful acts." (emphasis added)). Similarly, a conspiracy charge that alleges "one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy" is not duplicitous. *Kelley*, 461 F.3d at 830. In such a case, "the agreement among all the parties constitutes a single conspiracy," and not multiple conspiracies. *Id.*

Here, neither Count 1 nor Count 2 was duplicitous. Each count alleged a single conspiracy based on a single overarching agreement between Xu his co-conspirators that lasted from 2013 to at least April 1, 2018. For Count 1, the agreement was to steal aviation-related trade secrets from various non-Chinese companies intending and knowing that the offense would benefit the Chinese government and related entities. (*See* R. 1, indictment ¶ 12, at 5.) For Count 2, the agreement

37

was to steal the aviation trade secrets with the intent to convert the trade secrets' economic benefit to another, intending and knowing the offense would injure the trade secrets' owners. (*Id.* ¶ 16, at 13-14.) The indictment details the manner and means by which Xu and his co-conspirators allegedly sought to advance these parallel objectives over five years, consistent with Xu's job duties as an MSS officer. (*See id.* ¶¶ 3, 13, at 6-7.) While various co-conspirators allegedly performed different functions, the indictment alleges they did so "to accomplish the objects" of the two parallel five-year conspiracies, not as part of separate agreements. (*Id.*) As such, neither count is duplicitous. *See Kelley*, 461 F.3d at 830.

Xu argues that because the overt acts listed in Count 1 and 2 of the indictment involved the targeting of multiple aviation companies over the course of several years, each count actually alleged multiple conspiracies (Br. at 35.) Not so. While the indictment lists overt acts taken against three different aviation companies, the indictment alleges that each of those incidents were pursued in furtherance of the common, overarching agreement among the conspirators. (*See* R. 1, indictment ¶¶ 14, 18, at 8-12, 14.) Because the relevant offense for each

count is the agreement, the fact that the objects of the Count 1 and Count 2 conspiracies involved trade secret theft against multiple aviation companies does not render those counts duplicitous. *See Braverman*, 317 at 53-54; *Campbell*, 279 F.3d at 398 (holding indictment count alleging conspiracy to distribute three different drugs was not duplicitous).

Xu acknowledges that an indictment that alleges "one overall agreement" is not duplicitous, but contends that the indictment "never connected" the three sets of overt acts nor alleged that "all three transactions shared a common goal to obtain trade secrets." (Br. at 35.) The plain language of the indictment belies this claim. Count 1 and Count 2 of the indictment both explicitly allege that "Xu and others committed and caused to be committed" the overt acts in "furtherance of the conspiracy and to achieve the objects and purposes thereof." (R. 1, indictment ¶¶ 14, 18, at 8-12, 14.) Moreover, the three sets of overt acts are also consistent with the manner and means as alleged in the indictment. (*See id.* ¶ 12, at 6.)

Xu also claims that the district court created an "evidentiary morass" because it never articulated its rationale for denying Xu's

39

motions *in limine* related to different tranches of evidence. (Br. at 36.) The district court, however, explained its evidentiary ruling on the very first day of trial. (R. 174, trial tr., 2997.) It held that the evidence was intrinsic to the charged crimes and that the evidence would separately be admissible because it "speak[s] to the motivation, intent, modus operandi and the like." (*Id.*) Both rulings were correct, and Xu does not directly challenge either on appeal. Because Count 1 and Count 2 each alleged a five-year conspiracy to steal aviation-related trade secrets, evidence of Xu and his co-conspirators' attempts to target non-Chinese aviation companies during the relevant time period was directly probative of the charged crimes and properly admitted as intrinsic evidence without a limiting instruction. Moreover, the district court also avoided an "evidentiary morass" by excluding other evidence that it found fell outside the confines of the conspiracy as alleged. (*See* R. 190, trial tr., 4162.)

The district court's denial of the motion to dismiss also did not create any possible unanimity issues at trial, as Xu claims. (Br. at 38.) The jury was properly instructed that, to convict, they had to unanimously find that Xu and his co-conspirators had entered into an

40

agreement between 2013 and 2018 to commit economic espionage or trade secret theft. (*See* R. 195, trial tr., 4856-58, 4885.) *See also United States v. Harvey*, 653 F.3d 388, 396 (6th Cir. 2011) ("Jurors are presumed to follow instructions."). Xu speculates that the jury may not have been unanimous about the underlying overt acts committed in furtherance of the conspiracy—*i.e.*, some jurors "could have credited the conduct related to the Safran hacking, while others might have convicted on the conduct relating to GE Aviation." (Br. at 38.) But a jury is not required to unanimously agree on what overt acts were taken in furtherance of the conspiracy where, as here, those acts are not elements of the crimes. *See United States v. Hills*, 27 F.4th 1155, 1190 (6th Cir. 2022). Because the jury unanimously found the required elements to convict on the single conspiracies alleged in Counts 1 and 2, there is no basis to vacate those convictions, much less the convictions on Counts 3 and 4.

Finally, while Xu states that the "proof at trial compounded the duplicity problem" (Br. at 35), "proof at trial is irrelevant to the question of whether an indictment is duplicitous." *Singer*, 782 F.3d at 276. Moreover, Xu did not contend before the district court that the

41

evidence at trial created a variance from the indictment and does not raise the argument on appeal either. He has therefore waived any such argument on appeal. *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006).

In any event, the evidence at trial conformed to the allegations in the indictment and a single conspiracy as to both Counts One and Two. Among other things, the trial evidence established that the Chinese government had identified acquiring aviation-related technology as a key strategic objective; that the MSS played a key role in illicitly acquiring secret foreign technology for the Chinese government through industrial espionage; and that Xu and many of his co-conspirators were MSS operatives focused on stealing aviation-related technology. The evidence also revealed the overlapping involvement of multiple MSS operatives in targeting various foreign aviation companies, which is consistent with the actions being taken pursuant to a single agreement between the co-conspirators. For instance, Chai Meng participated in the hacking of Safran, the targeting of GE, and the recruitment of Arthur Gau, while Zha Rong was involved in the Safran hacking, the recruitment of Gau and Bin Liang, and the targeting of Li Jiang. (*See* R.

180, trial tr., 3152, 3090-91, 3198-99; R. 181, trial tr., 3213, 3217.) *See also United States v. Hughes*, 505 F.3d 578 (6th Cir. 2007) ("The principal considerations in determining the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings.").

Viewed in the light most favorable to the government, this evidence cannot "reasonably be construed as *only* supporting a finding of multiple conspiracies." *United States v. Sadler*, 24 F.4th 515, 541 (6th Cir. 2022). And given the overwhelming evidence, Xu was not prejudiced by any possible variance or duplicity issues in the indictment. *See id.*; *see also United States v. Anderson*, 555 F. App'x 589, 597 (6th Cir. 2014) (declining to decide whether indictment was duplicitous because any error was harmless beyond a reasonable doubt).

## II.  The district court did not abuse its discretion, let alone plainly err, in not striking portions of Olson's testimony.

This Court reviews a district court's evidentiary decisions under Federal Rule of Evidence 704(b) for abuse of discretion. *United States v. You*, 74 F.4th 378, 388 (6th Cir. 2023). When a party fails to timely object to an evidentiary issue at trial, however, review is for plain error. *Id.*; *see also* Fed. R. Evid. 103(a)(1). Because Xu objected on Rule 704(b)

grounds only once during Olson's testimony, the district court's decision to admit the remaining portions of Olson's testimony, to which he did not contemporaneously object (or move to strike), should be reviewed for plain error, even though he filed a motion to strike three days after Olson left the stand. *See You*, 74 F.4th at 388 (reviewing unpreserved 704(b) claim for plain error); *United States v. Pettigrew*, 77 F.3d 1500, 1516 n.14 (5th Cir. 1996) (applying plain error review to Rule 704(b) challenge where defendant did not contemporaneously object but filed a motion to strike the following day); *United States v. Spriggs*, 102 F.3d 1245, 1257 (D.C. Cir. 1996) (reviewing evidentiary argument for plain error where concerns about testimony were not raised until sidebar during cross-examination and motion to strike not made until following day). Even if reviewed for abuse of discretion, however, Xu's claim would fail.

Federal Rule of Evidence 704(b) provides that in a criminal case "an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." This Rule is triggered when an expert witness directly refers to the defendant's

44

intent, mental state or *mens rea*, provided that such is an element of the crime charged. *United States v. Dunnican*, 961 F.3d 859, 876 (6th Cir. 2020); *see also United States v. Warshak*, 631 F.3d 266, 324 (6th Cir. 2010) (holding that expert's use of phrases "intent to conceal" and "designed to conceal" "spoke directly to the core issue of the requisite *mens rea*"). The rule does not, however, preclude an expert witness from testifying about the methods and techniques employed in an area of criminal activity, or describing "in general terms the common practices of those who clearly do possess the requisite intent, leaving unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent." *Dunnican*, 961 F.3d at 876 (quotations omitted); *see also United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004) (holding testimony did not violate Rule 704(b) because expert testified "regarding conduct that would be consistent with an intent to distribute and left to the jury the final conclusion regarding whether [defendant] actually possessed the requisite intent"). Moreover, expert witnesses can share their "subjective assessment of the facts at hand" and opine on the effect of

defendant's actions, as long as they do not actually refer to the defendant's intent. *Dunnican*, 961 F.3d at 876.

Here, Olson's testimony did not violate Rule 704(b) because he never directly opined on whether Xu knowingly intended to steal trade secrets from GE or whether he intended to benefit a foreign government or instrumentality. *Cf. You*, 74 F.4th at 389 (rejecting 704(b) challenge where expert did not say anything about defendant's thoughts). Rather, Olson's testimony described in general terms the common practices of spies, including the recruitment cycle, and pointed out instances where Xu's conduct was consistent with, or indicative of, such practices. (*See, e.g.*, R. 192, trial tr., 4638 (conduct "typical" of intelligence operation); *id.* at 4639 (alias "consistent with the cover used by an intelligence officer); *id.* at 4639-40 (communication "very characteristic" of an intelligence operation); *id.* at 4654 (request to download files "very consistent with a case officer's effort to maximize the production"); *id.* at 4663 (wiping of phone would be indicative of espionage tradecraft).)

On appeal, Xu cherry-picks five of Olson's answers to claim that his testimony violated Rule 704(b). None of those answers, however, involved any testimony on the ultimate issue, which was whether Xu

46

attempted or conspired to *knowingly* steal[6] trade secrets (or otherwise

obtain them without authorization) and whether he did so either

*intending* that his theft benefit a foreign instrumentality (for economic

espionage) or *intending* to convert the economic benefit of the trade

secret to another (for trade secret theft).

Xu first points to Olson's testimony about a reference to "foreign

countries' structural materials" in one of Xu's emails to Zheng. (Br. at

41-42.)  Olson stated that this "meant that the objective was to obtain

this technology from foreign countries." (R. 92, trial tr., 4643.) At most,

Olson was simply restating Xu's own words in the email. This

statement did not violate Rule 704(b) because whether or not Xu

intended to obtain technology from a foreign country was not an

element of the charged crimes. *See United States v. Cox*, 826 F.2d 1518,

1524 (6th Cir. 1987) (noting that Rule 704(b) only prohibits testimony

on the ultimate issue of defendant's intent). In fact, Xu's intent to

obtain technology from abroad was not at issue in the case. Xu never

denied this was his goal. Rather, he claimed that although he wanted to

---

[6] While Xu complains about Olson's use of the word stealing,
"steal[ing]," or more broadly obtaining "without authorization," is the
*actus reus*, not the *mens rea*, for 18 U.S.C. §§ 1831 & 1832.

obtain technology from foreign countries, he was only interested in open-source, non-protected information and never attempted or conspired to *knowingly* obtain trade secret information without authorization. (*See, e.g.*, R. 194, trial tr., 4799, 4804-05.) The context of Olson's testimony makes clear that he never opined on whether Xu possessed that *mens rea*, as he stated in his very next answer only that Xu's email was "consistent with what I believe an intelligence service" would have in the form of requirements passed on to them from technical experts. (R. 192, trial tr., 4644-45; *see also id.* at 4613.)

Xu next claims that three other answers impermissibly opined on what he "was 'thinking' and "wanted.'" (Br. at 42.) But a full review of those portions of Olson's testimony indicates he again did not use these words to opine on Xu's possible criminal intent. For instance, Xu cites to Olson's testimony about wanting to wipe phones. Olson, however, did not testify that Xu wanted to wipe the phone (which in any event is not the ultimate issue); rather he testified that, in an intelligence operation, a person would want to wipe their phone whenever possible and that doing so was "indicative of espionage tradecraft." (R. 192, trial tr., 4663.) This is proper testimony under Rule 704(b). Xu also complains

that Olson testified that he was "pressing" and "pushing" Zheng for additional cooperation (*see* R. 182, trial tr., 4643) and later that he was pushing Zheng for additional stuff and thought Zheng was going to be a compliant source (*id.* at 4652). But the terms "pushing" and "pressing" as used by Olson refer to the *actions* Xu was taking toward Zheng—actions that Olson testified were consistent with the recruitment cycle—and not to Xu's mental state. Even if Olson's description of Xu as likely being encouraged because he thought Zheng would be compliant could be construed as remarking on Xu's mental state, that testimony still does not violate Rule 704(b) because Xu's belief on Zheng's potential compliance does not "constitute[] an element of the crime[s] charged." Fed. R. Evid. 704(b); *Cox*, 826 F.2d at 1524.

Finally, Xu argues that Olson's testimony that Xu's words and actions were "those of an intelligence officer conducting espionage" improperly opined on Xu's mental state because espionage and tradecraft involve stealing secrets (Br. at 40 (quoting R. 192, trial tr., 4667).) But this testimony related only to what Xu said and did and not Xu's mental state. The fact that certain actions are commonly associated with an intent does not preclude an expert from testifying

49

that a defendant engaged in those actions. For instance, even though individuals who package marijuana for resale generally do so with the intent to distribute the drugs, an expert may still opine that a defendant's drugs appeared to be packaged in that way. *See, e.g., Dunnican*, 961 F.3d at 876. So too here. Olson testified that Xu's actions and conversations bore all the hallmarks of a person engaged in espionage. While it is true that people engaged in tradecraft often intend to steal secrets or acquire them without authorization (much like people who package drugs for resale intend to distribute them), an individual engaged in classic espionage recruitment-type activities could, in theory, do so without the intent to steal trade secrets (just as a person who packages marijuana in a manner consistent with resale may not intend to distribute it). Indeed, this was Xu's argument at trial—that despite all the activities consistent with espionage he had no intent to acquire any trade secret without authorization. (*See* R. 194, trial tr., 4801-05.) Because Olson did not opine on this question and instead left it to the jury to infer Xu's intent, the district court did not abuse its discretion, let alone plainly err, in admitting the testimony.

50

In any event, even if any portion of Olson's testimony could be construed to touch upon Xu's intent, any error in admitting the testimony was harmless in light of the district court's jury instructions and the overwhelming evidence of Xu's intent. S*ee United States v. Miner*, 774 F.3d 336, 348 (6th Cir. 2014).

First, the court properly instructed the jury that, to the extent Olson testified that Xu intended to steal trade secrets, they must disregard those portions of Olson's testimony because "it is up to you and you alone to determine whether the defendant intended to steal trade secrets." (R. 195, trial tr., 4878). Defense counsel emphasized this instruction in closing arguments, telling the jury to "remember that special instruction" about Olson. (R. 194, trial tr., 4803.) This cautionary instruction had the same practical effect as granting Xu's belated motion to strike and minimized any possibility that Olson's testimony could have invaded the jury's role as the ultimate finder of fact. *See United States v. Shaffer*, 781 F. App'x 404, 413 (6th Cir. 2019) (holding any Rule 704(b) error was harmless where the court "mitigated any potential harm by issuing clear and comprehensive jury instructions"). Contrary to Xu's claims on appeal (Br. at 45), this

instruction provided sufficient guidance. It specifically instructed the jury to disregard any testimony about Xu's mental state and went beyond more generic cautionary instructions this Court has found sufficient to cure potential Rule 704(b) error. *See Shaffer*, 781 F. App'x at 413; *United States v. Shaffer*, 2:16-cr-45 (E.D. Ky Aug. 10, 2017) (jury instructions), at *44. Additionally, the district court also provided defense counsel an opportunity to comment on its proposed instruction and then incorporated those edits into the final form. (*See* R. 216, charge conf. tr., 5487, 5507-08.)

Second, any error was also harmless in light of the voluminous evidence that Xu intended to steal GE trade secret information. Among other things, he used an alias when communicating with Zheng (R. 192, trial tr., 4509-10), warned Zheng not to use his company email when sending him sensitive materials (R. 181, trial tr., 3331), directed Zheng to select a meeting location where he would not be seen by his co-workers (R. 191, trial tr., 4312), and employed a cover story when traveling in Europe (R. 181, trial tr., 3241-43)—none of which would have been needed if Xu was only after open-source information and not proprietary trade secrets. He also asked Zheng to create a file directory,

gave him step by step instructions on how to do so, and sent him a list of "domestic requirements," the discussion of which would have led to GE trade secrets. (R. 181, trial tr., 3336-41.) And when Zheng sent the file directory, Xu stepped up his pursuit: he called Zheng, asked him to download the GE files and bring them to a meeting, and showed up for the meeting in Belgium with blank a hard drive and memory cards to receive the stolen files. (*Id.* at 3351, 3555, 3360, 3666-70; R. 187, trial tr., 3784-86.) On top of this, Xu brought envelopes of cash with him to the meeting, along with hundreds of photos of Zheng and his family and a list of handwritten questions, the discussion of which would have led to GE proprietary information. (R. 187, trial tr., 3707-08, 3740-41, 3768.) These are not "everyday occurrences" as Xu claimed at trial (R. 194, trial tr., 4802-03), but overwhelming evidence that Xu was attempting to knowingly steal GE's trade secrets.

## III.  Xu's sentence was procedurally and substantively reasonable.

A.  *The district court's loss calculation reasonably estimated the intended loss to GE.*

This Court reviews legal questions surrounding a district court's calculation of a Guidelines range *de novo. United States v. You*, 74 F.4th

378, 396 (6th Cir. 2023). A district court's determination of the amount of a loss attributable to a defendant is reviewed only for clear error, however. *Id.* at 398. This is because "district courts are well positioned to assess the evidence and estimate loss." *Id.*

The Sentencing Guidelines provide for incremental increases to the offense level for defendants convicted of fraud and theft offenses based on the amount of "loss." U.S.S.G. § 2B1.1(b); *see also You*, 74 F.4th at 397. While the Guidelines do not define the term "loss," the commentary to the Guidelines "explains that, generally, loss is the 'greater of actual loss or intended loss.'" *You*, 74 F.4th at 397 (quoting U.S.S.G. § 2B1.1 cmt. n.3(A)). According to the commentary, actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A). Intended loss, by contrast, is the "the pecuniary harm that the defendant purposely sought to inflict," and includes "harm that would have been impossible or unlikely to occur." *Id.*

This Court has repeatedly recognized that determining the value of a trade secret is "no easy task." *You*, 74 F.4th at 398 (quoting *United States v. Howley*, 707 F.3d 575, 582 (6th Cir. 2013)). As such, "district

54

courts need not reach an exact figure for the loss that a victim suffered or the amount of harm that a defendant caused or intended to cause; a 'reasonable estimate' will do," provided that the court provides "some explanation." *Id.*

Xu first argues that the district court erred in relying on the commentary's definition of loss. (Br. at 46-51.) This Court, however, addressed, and rejected, this argument in a published opinion subsequent to Xu filing his appellant brief. In *You*, this Court held that the commentary's definition of "loss" is entitled to deference under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), and that districts courts properly consider intended loss in calculating a defendant's Guidelines range. 74 F.4th at 397. *You*'s holding is directly on point and forecloses Xu's first argument.

Xu next challenges the district court's intended loss calculation as unreasonable. (Br. at 52-56.) He claims both that there was no evidence he intended to cause any loss to GE and that the district court's $50 million intended loss calculation based on GE future lost profits was speculative. Neither claim has merit.

55

First, the district court did not clearly err in finding that Xu, a loyal member of China's Ministry of State Security, intended to cause pecuniary harm to GE when he attempted to steal its trade secrets to benefit China. In addition to the evidence showing that Xu specifically targeted GE's trade secret technology, the government also adduced evidence (1) that GE's valuable composite fan blade technology provided it a significant competitive advantage and sizable market share across the globe and in China (R. 191, trial tr., 4458); (2) that the Chinese government has prioritized developing its domestic aviation industry, including building a commercial airliner and advanced aircraft engines, with the intent to replace foreign companies with state-owned enterprises that will compete with the foreign companies (R. 161, trial tr., 2069, 2074-76, 2088; *see also* R. 206, gov't mem., 5158, 5160-62, 5173); and (3) that the Chinese government uses the MSS to advance this goal via industrial espionage and the illicit transfer of technology from foreign companies (R. 161, trial tr., 2077, 2080-83, 2088). This evidence was more than sufficient for the district court to find that Xu, in attempting to steal GE's valuable trade secrets and provide them to Chinese companies, intended to cause GE pecuniary harm through this

'replicate and replace' strategy. Indeed, Xu's assertion on appeal that there was no intended loss is "at odds with [his] convictions for stealing property that had 'independent economic value.'" *Howley*, 707 F.3d at 582.

Second, the district court's $50 million loss calculation was a reasonable estimate and not clearly erroneous. In *You*, this Court specifically endorsed using a targeted company's hypothetical lost profits (rather than revenues) to estimate intended loss from an attempted trade secret theft. *See You*, 74 F.4th at 398-90. In fact, the *You* Court cited approvingly to the district court's loss calculation order in this case, holding that the district court in *You* should have followed the same methodology. *Id.* Moreover, unlike the district court order in *You*, the district court's order here was internally consistent and fully explained its reasoning. (*See* R. 208, order, 5229-38.)

The district court's implementation of the methodology was also extremely conservative, erring in favor of Xu at every juncture and likely undervaluing the intended loss. For instance, even though the court found that Xu intended for China to establish dominance in the industry (such that a 100% market share capture would be

57

appropriate), it limited its loss calculation to a scenario in which China captured just 1% of GE Aviation's commercial engine market share. Given that the Asia market (and China in particular) represents a significant and fast-growing market segment (*see* R. 206-7, 2022 Market Forecast, 5195-5200), a Chinese engine based on GE's trade secret technology would likely have captured a much higher percentage of GE's market share.

The district court also limited the temporal scope of the loss calculation to just a single year, even though the Chinese government's goal was to establish and maintain market dominance. (R. 161, trial tr., 2067-70, 2076, 2088.) Finally, the district court's loss calculation excluded lost profits to GE's "Systems & Other" business line, even though a portion of that market would have been captured by a Chinese competitor engine. The court noted it would be appropriate to include a portion of this market in its loss calculation, but elected not to do so for the sake of simplicity because including that loss would not change the offense level. (*See* R. 208, order, 5235, n.9.)

On appeal, Xu faults the district court for relying on GE's publicly available revenue and profit data because it was not introduced at trial

or the evidentiary hearing. (Br. at 54.) Xu does not dispute the veracity of the data, however, let alone contend that it was clearly erroneous. Nor was Xu somehow prejudiced by the district court's reliance on the data. The government submitted the relevant data to the district court in its post-hearing brief as part of its response to Xu's argument that the proper loss calculation should be based on loss market share and not development cost.[7] (*See* R. 206, gov't mem., 5191.) Xu had the opportunity to respond, and did respond, to this data and the government's market share loss calculation in his reply brief. (*See* R. 207, def.'s reply mem., 5215-18.)

Xu also asserts that the court's methodology was speculative and "rife with unfounded assumptions." (Br. at 55.) He claims that the court should have factored in the possibilities that other competitors would develop the same technology, independently eating into GE's market share, or that China's production timeline might not have been altered by acquiring GE's technology. Xu's argument is flawed. Legally, the

---

[7] While the government did not submit the 2019 GE annual report that the district court cited in its order, the government did submit GE's 2021 annual report, which included the relevant 2019 revenue and profit data, in support of its post-hearing brief on loss calculation. (*See* R. 206-6, GE 2021 Annual Report, 5191.)

relevant measure is the pecuniary harm that Xu intended to cause, even if such harm was "impossible or unlikely to occur." U.S.S.G. § 2B1.1 cmt. 3(A)(ii). And because Xu intended for his conduct to result in China fulfilling its ambition to create a competitor engine and capture GE's market, the proper loss calculation need not be discounted for the possibility that Xu's theft, if successful, would not have caused the full harm he intended.

Xu's claims are also factually unsupported. It is Xu that speculates that perhaps Rolls Royce or another competitor could have broken GE's monopoly before China did. However, it is undisputed that since GE developed the technology in 1995 no competitor has been able to successfully certify an engine of similar design, and that Rolls-Royce nearly went bankrupt trying to do so. (R. 191, trial tr., 4458.) Xu's defense expert also speculated that GE's trade secrets would not have benefitted China's engine development. That expert, however, had never worked on commercial aviation engines, did not have access to GE's proprietary information, and had no special insight into the state of China's technology, relying instead on publicly disclosed research and

his own internet searches.[8] (*See* R. 204, hearing tr., 5070.) Notably, Xu

took significant risk, including traveling outside of China, in his

attempt to steal GE's trade secrets. This indicates that Xu, who was

consulting with China's internal experts and had special insight into

the state of China's technology, believed the information he would

acquire from Zheng, both in Belgium and in future encounters, was

valuable to China and likely to assist its development of a competitor

engine.

In any event, Xu's claims also fail because the district court, as a

practical matter, factored in the possibility that Xu's efforts would not

have realized the full intended loss. As noted above, the court assumed

China would only capture 1% of GE's commercial engine profits and

---

[8] Xu's citation to the cross-examination of GE chief engineer Nicholas Kray at the evidentiary hearing is also unavailing. Kray never opined that it would be "impossible" to reasonably estimate future lost profits, as Xu claims. (Br. at 55.) Consistent with his technical expertise, Kray's testimony focused on the cost of developing the trade secret technology, not future lost profits. Moreover, when asked about calculating lost profits on cross-examination, he answered, "I would say the number would only go up." (R. 204, hearing tr., 5008.) And when defense counsel pressed that Kray couldn't "put a number on that right now," Kray responded, "Okay. Another way to look at it, sure." (*Id.*) This testimony does not undermine the district court's calculation, much less render it clearly erroneous.

limited the loss to just one year. These limitations account for numerous

possibilities that might have mitigated GE's loss, including the ones Xu

identifies in his appellant brief. While Xu quibbles with this

accounting,[9] this Court has recognized that trade secret loss

calculations are inherently difficult and will involve some level of

estimation. *You*, 74 F.4th at 398. The district court's conservative

calculation here provided a reasonable estimate and was not clearly

erroneous.

B. *The 240-month within-Guidelines sentence was substantively reasonable.*

This Court reviews the substantive reasonableness of a sentence

for abuse of discretion. *United States v. Miller*, 73 F.4th 427, 431 (6th

Cir. 2023). A within-Guidelines sentence is presumed to be

---

[9] Among other things, Xu contends that the court should have restricted lost profits to the particular engine on which Zheng was working and applied a lower profit margin to GE's commercial engine revenues. (Br. at 56.)  But the court's methodology provided a reasonable estimate, especially where Xu intended to steal the underlying technology that provided GE its competitive advantage in the marketplace and there is no basis to believe that GE's commercial engine segment had a lower profit margin than its military engine segment, which also involves high production costs.  Moreover, even if the intended loss were reduced by an additional 50%, Xu's Guidelines range would be unaffected. *See* U.S.S.G. § 2B1.1(b).

substantively reasonable. *Id.* A "defendant can rebut this presumption if a district court chose a sentence arbitrarily, ignored pertinent § 3553(a) factors, or gave unreasonable weight to any single factor." *Id.*

The within-Guidelines sentence here was substantively reasonable. The district court did not choose the sentence arbitrarily, but rather weighed the pertinent § 3553(a) factors. First, the 240-month sentence was necessary to reflect the seriousness of Xu's crimes. As the district court found, the scale and the scope of Xu's espionage was "extraordinary." (R. 214, sentencing tr., 5432.) He engaged in a years-long conspiracy to "steal the properties of foreign companies knowing full well the damage it would cause the businesses and the countries." (*Id.* at 5432-33.) In addition to targeting the various companies identified at trial, Xu also played a key role in the handling and placement of another MSS operative, Ji Choaqun, as a spy in the U.S. Army Reserves. (*See* R. 209, gov't sentencing mem., 5252-57.)

Second, the district court also properly considered the need for the sentence to protect the public from further crimes and provide specific and general deterrence. Xu's long history as an MSS operative targeting commercial and military secrets shows that he presents a significant

danger to both U.S. aviation companies and the U.S. military. That danger is compounded by the fact that Xu was largely able to commit these crimes from the safety of China and will be out of reach of U.S. law enforcement if, and when, he eventually returns to China. As the district court concluded, a within-Guidelines sentence is needed both to deter Xu specifically from returning to economic espionage upon his release and to deter others, in China and elsewhere, from similarly targeting U.S. companies. (*See* R. 214, sentencing tr., 5434-35.)

On appeal, Xu argues that the district court, nevertheless, abused its discretion because defendants in other districts convicted of trade secret theft received shorter sentences than the 120-month sentences Xu received for the trade secret offenses in Counts 2 and 4. (Br. at 57.) Xu's argument is fundamentally flawed, however, as the sentences on Counts 2 and 4 here cannot be viewed in isolation, but were instead part of an aggregate 240-month sentence for all counts of conviction. (R. 214, sentencing tr., 5437.) *See* U.S.S.G. § 5G1.2. Moreover, the defendants in the cases Xu cites were not similarly situated. They were company insiders convicted of stealing or conspiring to steal trade secrets from their companies—not international spies who repeatedly

64

targeted multiple aviation companies using sophisticated means over a five-year period as part of a state-sponsored conspiracy to undermine non-Chinese companies.[10] Under these circumstances, the difference in the sentences was warranted.

---

[10] The difference between Xu and his proposed comparators is reflected in their vastly different Guidelines ranges. For instance, in both *United v. Jin* and *United States v. Shi,* the Guidelines range was just 78-to-97 months' imprisonment. *See United States v. Jin*, 733 F.3d 718, 722 (7th Cir. 2013); *United States v. Shi*, No. 17-cr-110 (D.D.C. Feb. 10, 2020) (sentencing tr.), at *33. And in *United States v. Pu*, the government and defense counsel agreed on a sentence range of just 12-to-18 months following Pu's guilty plea, resulting in an 18-month sentence, not 48 months as stated in Xu's appellant brief. *Pu*, 1:11-cr-699 (N.D. Ill. May 5, 2016) (sentencing tr.), at *52-53. In contrast, Xu's 210-to-260 months Guidelines range reflected his higher intended loss as well as enhancements for his management role and his use of sophisticated means. (*See* R. 197, PSR, 4906-08.)

# CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

/s/ Kevin Koller
KEVIN KOLLER
Assistant United States Attorney
221 E. Fourth Street
Suite 400
Cincinnati, Ohio 45202
(513) 684-3711
kevin.koller@usdoj.gov

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation provided in Rule 32(a)(7)(B)(i) of the Federal Rules of Appellate Procedure. The brief contains 12,861 words of Century Schoolbook (14 pt) proportional type. Microsoft Word is the word-processing software that I used to prepare this brief.

/s/ Kevin Koller
KEVIN KOLLER

## DESIGNATION OF RELEVANT
## DISTRICT COURT DOCUMENTS

The following are relevant under Sixth Circuit Rule 30(g).

| Record number | Description | PAGE ID# |
|---|---|---|
| 1 | indictment | 1–16 |
| 55 | motion | 367–387 |
| 68 | response | 479–491 |
| 84 | transcript | 842–897 |
| 131 | transcript | 1620–1648 |
| 161 | transcript | 1974–2151 |
| 166 | motion | 2367–2372 |
| 168 | response | 2574–2579 |
| 174 | transcript | 2832–2999 |
| 176 | jury verdict | 3004–3007 |
| 180 | transcript | 3024–3204 |
| 181 | transcript | 3205–3412 |
| 187 | transcript | 3666–3825 |
| 188 | transcript | 3826–3978 |
| 189 | transcript | 3979–4132 |

| 190 | transcript | 4133–4295 |
| 191 | transcript | 4296–4493 |
| 192 | transcript | 4494–4693 |
| 194 | transcript | 4718–4832 |
| 195 | transcript | 4833–4891 |
| 197 | presentence report | 4894–4935 |
| 204 | transcript | 4961–5107 |
| 205 | objections | 5108–5133 |
| 206 | memorandum | 5134–5204 |
| 207 | memorandum | 5205–5219 |
| 208 | order | 2550–5238 |
| 209 | sentencing memorandum | 5239–5330 |
| 211 | judgment | 5354–5358 |
| 213 | notice of appeal | 5367–5368 |
| 214 | transcript | 5369–5455 |
| 216 | transcript | 5459–5508 |

# CERTIFICATE OF SERVICE

I certify that this Brief for Plaintiff-Appellee United States was served on counsel for Defendant-Appellant Xu by filing with the Court's CM/ECF system this 11th day of September, 2023.

/s/ Kevin Koller
KEVIN KOLLER